UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                      )
THIRU SATCHI, AS ADMINISTRATOR,       )
OF THE ESTATE OF,                     )
YOGAMBIGAI PASUPATHIPILLAI            )
                                      )
            Plaintiff,                )
                                      )
        v.                            )          CIVIL ACTION
                                      )          NO. 16-10521-WGY
RHEON U.S.A., INC.,                   )
                                      )
            Defendant.                )
_____)


YOUNG, D.J.                                      JUNE 12, 2017


**MEMORANDUM AND ORDER**

I.    **Introduction**

      This case concerns the tragic death of Yogambigai

Pasupathipillai ("Pasupathipillai").  On August 6, 2013,

Pasupathipillai suffered a fatal accident while working at the

Piantedosi bakery in Malden, Massachusetts.  Compl. ¶ 9, ECF No.

1-1.  Thiru Satchi ("Satchi"), as administrator of

Pasupathipillai's estate, brings this motion against Rheon,

U.S.A. ("Rheon"), the alleged manufacturer of the equipment that

killed Pasupathipillai.  Compl. ¶ 2, ECF No. 1-1.

      Rheon is the American distributor for Rheon Automatic

Machinery, a Japanese manufacturer of commercial food production

equipment.  Rheon U.S.A.'s Statement Undisputed Material Facts
Supp. Mot. Summ. J. ("Def.'s Statement Facts") ¶ 8, ECF No. 45.
Satchi alleges Rheon negligently designed bakery equipment used
at the Piantedosi facility, and alleges it is this negligently-
designed equipment that caused Pasupathipillai's death.  Id.
Consequently, Satchi seeks damages in negligence, breach of
warranty, and breach of Massachusetts General Laws chapter 93A,
id. ¶¶ 17, 24, 28, 32, 34.  Rheon denies these allegations and
seeks summary judgement on all counts.  Def., Rheon U.S.A.,
Inc.'s Mem. Law Supp. Mot. Summ. J., ECF No. 43.  Rheon asserts
it was Piantedosi, and not Rheon, that designed the equipment
that killed Pasupathipillai.  Def., Rheon U.S.A. Inc's, Mem. Law
Supp. Mot. Summ. J. 2, ECF No. 44.

Because Rheon did not manufacture the piece of equipment
upon which Pasupathipillai was killed, and did not contractually
assume liability for that equipment, there is no legal basis
upon which Rheon may be held liable for Pasupathipillai's death.
Accordingly, this Court GRANTS Rheon's motion for summary
judgement on all counts, for the reasons delineated infra.

## II.  Undisputed Facts

The following facts are recited from the record available
to this Court and are read in the light most favorable to Satchi
as the non-moving party.  See Fed. Rule Civ. Proc. 56.

## A. Accident and Allegations

Pasupathipillai was an employee of the Piantedosi commercial bakery, located in Malden, Massachusetts. Compl. ¶¶ 5-6; Def.'s Statement Facts ¶¶ 1-2. On August 6, 2013, Pasupathipillai's clothing became entangled in a conveyor belt while she was working at Piantedosi's facility. Compl. ¶ 9; Def.'s Statement Facts, Ex. 3, Dep. Souen Touch ("Touch Dep.") 59:23-60:9, ECF No 45-4; Def.'s Statement Facts, Ex. 4, Dep. Oscar Rene Paredes ("Paredes Dep.") 43:1-11, ECF No. 45-5. Pasupathipillai's fellow employees tried to shut off the conveyor belt and cut her clothing free of the machine. Touch Dep. 60:24-61:8, 61:9-22; Paredes Dep 43:7-17. Despite that aid, Pasupathipillai sustained substantial injuries, Touch Dep. 62:2-10; Parades Dep. 43:18-44:2, and tragically died several days later. Def.'s Statement Fact, Ex. 6, Report of Autopsy ("Autopsy") 3, ECF No 45-7.

Satchi alleges Piantedosi purchased from Rheon the conveyor system responsible for Pasupathipillai's death. Compl. ¶ 14. Alternatively, Satchi alleges Rheon contractually assumed liability for the machine in question. Id. at ¶ 19. Satchi further alleges the conveyor system responsible for Pasupathipillai's death lacked essential safety systems and other guarding mechanisms. Id. at ¶ 11. Given those deficiencies, Satchi alleges Rheon was negligent (or

contractually assumed liability for negligence) in the design of the conveyor system. Id. at ¶ 17. Additionally, Satchi alleges Rheon breached implied and express warranties of safety and fitness for use, id. at ¶¶ 22, 27, 30 and violated Mass. Gen. Laws c. 93A, id. at ¶ 34.

**B. Piantedosi Purchased Some of the "Rheon Line"**

In June, 2007, Piantedosi solicited a quote from Rheon concerning the installation of a "Stress Free Artisan Bread Line." Def.'s Statement Facts, Ex. 8, June 2007 Proposal For: "Stress Free Artisan Bread Line" ("June 2007 Proposal"), ECF No. 45-8. In August, 2007 Piantedosi opted to purchase some of the equipment Rheon proposed in the June 2007 quote. Def.'s Statement Facts, Ex. 9, August 2007 Proposal For: "Stress Free Artisan Bread Line" 3 ("August 2007 Contract"), ECF No. 45-9. This sequence of equipment was often referred to as the "Rheon Line" or "Rheon's line." E.g. Def.'s Statement Facts, Ex. 2, Dep. Nada Somasundram ("Somasundram Dep.") 74:9; Pl.'s Mem. Law Supp. Pl.'s Opp. Def. Rheon's Mot. Summ. J., Ex. 3, August 31, 2007 Fax From T. Horichi ("August 31 Fax") 3, ECF No. 55-5.

In particular, one element Piantedosi chose not to buy from Rheon was the "tray feeder with corner slider" (i.e., the conveyor belt). Somasundram Dep. 132:2-20; Aff. Sinchi Toda ("Toda Aff.") ¶ 14, ECF No. 46; Pl.'s Resp. Concise Statement Material Facts in Dispute Supp. Opp. Def. Rheon's Mot. Summ. J.

("Pl.'s Statement Facts") ¶ 20, ECF No. 70. This alteration
meant that two pieces of Rheon equipment, the flour duster and
cornmeal duster, were listed as "options" that would
independently need to be mounted to whatever tray feeder device
Piantedosi supplied. Toda Aff. ¶ 14; Pl.'s Statement Facts ¶
20.

The parties signed a contract consummating their agreement.
August 2007 Contract _passim_. The contract constituted an
"entire agreement" and extended only to the machines specified
in the August 2007 tender. _Id._ at 8. The August 2007 contract
did not list a conveyor belt, corner slider, or tray feeder
amongst its terms. _Id._

The contract included a limited warranty for the goods sold
by Rheon. _Id._ The contract did not indicate Rheon would assume
liability for any piece of equipment assembled and installed by
Piantedosi. _Id._ ("Both parties acknowledge that installation
of the machine(s) requires special enterprise and consequently
agree that unless seller's Personnel install equipment and/or
machines purchased from seller, this warranty shall be null and
void, and Seller will in no manner, be liable for defects and/or
damage to goods purchased.").

### C. Design of the Piantedosi Conveyor Belt

Rather than purchase the Rheon tray feeder, Piantedosi's chief engineer, Nada Somasundram ("Somasundram"), designed and built a conveyor belt in-house. Somasundram Dep. 132:2-20.

#### 1. Somasundram Designed and Constructed the Conveyor Belt

Somasundram never completed a technical schematic of the conveyor belt. See Somasundram Dep. 132:21-137:14. Only a rough sketch was sent to Rheon, indicating the length and width of the conveyor. Id. at 35:4-17; Toda Aff. ¶ 25. Additionally, when designing this particular conveyor belt, Somasundram did not recall consulting relevant Occupational Health and Safety Administration ("OSHA") regulations, Somasundram Dep. 138:11-22, though he does assert that such a consultation was his usual practice, id. at 138:5-7.

#### 2. Mroszczyk and Corliss Reports

Rheon alleges that it had no input into the design, construction, or installation of Somasundram's conveyor belt. Toda Aff. ¶¶ 15, 22, 27. Satchi disputes that characterization and asserts the "[c]onveyor was systematically designed and incorporated as part of the Rheon Line." Pl.'s Statement Facts ¶ 21. As support for that assertion Satchi includes expert reports by safety engineers John M. Corliss ("Corliss") and John Mroszczyk ("Mrosczyk"). Aff. John M. Corliss ("Corliss Aff."), ECF No. 55-1; Aff. John Mroszcyz ("Mroszcyzk Aff."), ECF No. 55-

2. Both engineers conclude "[t]he board in-feed conveyor was part of the Rheon line . . . ." Corliss Aff. ¶ 8; Mroszcyzk Aff. ¶ 7; See also Def. Statement Material Facts, Ex. 14-A, Report John Mroszcyzk ("Mroszcysk Report"), ECF No. 45-15; Def. Statement Materials Facts, Ex. 14-B, Expert Report John M. Corliss ("Corliss Report"), ECF No. 45-16.

Satchi argues that Rheon played an integral role in the design and development of Somasundram's conveyor belt because Rheon advised Somasundram of such factors as the proper location of holes by which to connect the optional flour and cornmeal dusters, and the optimal rate and height for the conveyor belt. Pl.'s Mem. Law 5. Indeed, in several documents, Rheon <u>does</u> indicate it provided minimal advice or limited specifications to Piantedosi. E.g., August 31 Fax 3; Pl.'s Mem. Law, Ex. 4, Sept. 12 2007 Fax From T. Horiuchi ("Sept. 12 Fax") 3, ECF No. 55-6; Pl.'s Mem. Law, Ex. 5, Sept. 19 2007 Fax from H. Kimura ("Sept. 19 Fax") 3, ECF No. 55-7. Consequently, in his expert report, Mroszcysk opined that because Somasundram communicated with Rheon regarding those factors, the "conveyor [belt] was built by Piantedosi to Rheon specifications. It interfaced with the Rheon line and was part of the overall Rheon system." Mroszcysk Report 4.

**D. Installation and Inspection of the "Rheon Line"**

Somasundram and his team assembled the conveyor at the Piantedosi facility. Somasundram Dep. 35:23-36:1, 102:12-24. Rheon did not participate in the manufacture of the conveyor nor did Rheon assist in installing that conveyor at Piantedosi's bakery. Aff. Masahiro Kameyama ("Kameyama Aff.") ¶ 4, ECF No. 47. Installation of the conveyor was accomplished separately from installation of the Rheon equipment, and occurred overnight, while the Rheon employees were off-site. Id. The conveyor belt was neither electrically nor physically connected to any piece of Rheon-installed equipment. Somasundram Dep. 154:14-157:2. Consequently, the on/off switch for the Piantedosi conveyor belt had no effect on the Rheon equipment. Id. at 156:8-22, 221:15-222:10 ("Q. If someone hit the emergency stop on the Rheon line, that would not stop the subject conveyor, correct? A. No. Q. Because it was separate electronically? A. Yes.").

The Rheon equipment purchased in the August 2007 contract was assembled in Japan prior to shipment to the United States. Toda Aff. ¶ 23. Prior to shipment, Rheon representatives demonstrated the equipment for Piantedosi representatives, including Somsundram. Id.; Def. Mem Law, Ex. 11, Video Taken During Demonstration of Rheon Line ("Rheon Line Video"), ECF No. 45-12. A video of the demonstration plainly demonstrates that

neither conveyor belt nor tray feeder was in use in the Rheon
line exhibited for Piantedosi. Rheon Line Video. That is, when
Piantedosi representatives had the "Rheon Line" demonstrated for
them, it was obvious to all witnessing the demonstration that
the Rheon Line did not include a conveyor belt or tray feeder --
it was expected that Piantedosi would be manufacturing those
components itself.

After the Rheon equipment and the conveyor belt were
installed, Rheon employees ran test batches to ensure the Rheon
equipment properly delivered dough through the system. Kameyama
Aff. ¶¶ 6-7; Toda Aff. ¶ 28; Pl.'s Mem., Exh. 6, Rheon Trip
Report 5/11/2008, ECF No. 55-8 ("Installation went smoothly. And
Test by dammy dough was no ploblem [sic]. And we instructed how
to clean."); Pl.'s Mem., Exh. 7, Business Trip Report 10/3/2008,
ECF No. 55-9 (Purpose of visit was to assess "baking tests");
Pl.'s Mem., Exh. 8, Business Trip Report 3/17/2009, ECF No. 55-
10 (Purpose of trip was "Re instruction & machine check"; focus
of report was on "production" such as "output base speed").
Rheon's documents make plain that the tests focused upon the
efficacy of the Rheon machines, i.e., whether the equipment
could deliver dough. E.g. Business Trip Report 10/3/2008 (Refers
to "Baking Tests"). Indeed, even Piantedosi employees
understood that the purpose of these tests was to assess
efficacy, not safety. E.g., Somasundram Dep. 187-17-19 ("They

set up the equipment to make sure that's the equipment we ordered and that's what it will do.").

Satchi alleges that during these tests Rheon had an opportunity to observe that the conveyor system did not conform to safety standards and therefore had an affirmative duty to warn Piantedosi of safety hazards. Pl.'s Statement Facts ¶¶ 67— 69. In particular, Satchi cites to the Corliss and Mroszczyk affidavits. Both experts allege "Piantedosi did not have to request a safety inspection or safety engineering analysis for Rheon to know and advise Piantedosi against use of the conveyor until a guard was placed over the tail-end given Rheon's expertise." Corliss Aff. ¶ 5; Mroszczyk Aff. ¶ 5. Satchi alleges that Rheon did not perform such a safety check nor did it warn Piantedosi of any safety problems inherent to the Somasundram-designed conveyor belt. Pl.'s Statement Facts ¶ 69.

Finally, Satchi alleges that a section of Rheon's user manual rendered Rheon responsible for conducting an initial safety check of the entire Rheon Line, including the conveyor belt. Pl.'s Mem. Law 12. The section indicates:

> [I]nitial compliance in the design of the machinery is
> the responsibility of the designer and installer of
> the system. In addition to the guards and other
> safety devices on the machinery, additional guards,
> safety equipment, warning signs, etc. may be necessary
> according to the use of the system and its location.
> A safety study must be made to determine such possible
> additional requirements, and appropriate safety
> measures to be taken. As the manufacturer, we insist

> on compliance with such safety standards, and will not
> knowingly sell or products to those who fail to
> comply.

Pl.'s Mem. Law, Ex. 9, Rheon-000670 ("Manual Excerpt"), ECF No.

55-11.  Satchi argues Rheon breached the express warranty

communicated in that manual by selling equipment that was not

OSHA compliant and by not undertaking "the self-mandated safety

study."  Pl.'s Mem. Law 12.

## III. Analysis

### A. Jurisdiction

Satchi, as administratior for Pasupathipillai, is a

Massachusetts domiciliary.  Compl. ¶ 1; See 28 U.S.C. §

1332(c)(2).  Rheon, U.S.A. is a New Jersey corporation with a

principal place of business in California.  Def., Rheon U.S.A.,

Inc.'s, Answer, Affirm Defenses and Jury Demand ("Answer") ¶ 2,

ECF No. 7.  Satchi seeks $362,783.15 in damages from Rheon.

Civil Action Cover Sheet, ECF No. 1-1.  Accordingly, this Court

may properly exercise federal diversity jurisdiction in this

matter.  See 28 U.S.C. § 1332(a)(1).  The parties have not

challenged the personal jurisdiction of this Court.

### B. Summary Judgement Standard

Summary judgement is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as matter of law."  Federal Rule

Civil Procedure 56(a).  A fact is construed as being material "if it potentially affects the outcome of the case."  Caribbean Forms Mfrs, Inc. v. Karon, 73 F. 2d 139, 140 (1st Cir. 1999).  A genuine issue is one which could be "resolved in favor of either party at trial."  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006).

The moving party must cite to specific points on the record supporting the contention that there is no material factual dispute.  Fed R. Civ P. 56(b).  When assessing the relevant facts, the court views the record in the manner most favorable to the non-moving party and may draw reasonable inferences in that party's favor.  Lohnes v. Level 3 Communs., Inc., 272 F.3d, 49, 50 (1st Cir. 2001); Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

In order to defeat a motion for summary judgement, the non-moving party "must establish the existence of a factual controversy that is both genuine and material."  Lohnes, 272 F.3d at 52.  To do so, the non-moving party must reference specific facts on the record which support the contention that there is a material factual dispute.  Id.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A mere denial of the moving party's pleading or a rote re-iteration of the complaint is insufficient to meet that burden.  Fed. Deposit Ins. Corp. v. Municipality of Ponce, 904 F.2d 740, 742-3 (1st Cir. 1990).

Instead, the non-moving party must "present affirmative evidence" in support of its argument.  Anderson, 477 U.S. at 256-57.

### C. Massachusetts Product Liability Law

In both product liability and warranty liability actions, a fundamental pre-requisite to a successful claim is that a plaintiff must demonstrate she was injured by a product produced by the particular defendant she seeks to hold liable. Mathers v. Midland-Ross Co., 403 Mass. 688, 691 (1989) (Abrams, J.) ("A plaintiff who sues a particular manufacturer for product liability generally must be able to prove that the item which it is claimed caused the injury can be traced to that specific manufacturer."); Al-Yaseri v. TMB Baking, 166 F. Supp. 3d. 118, 122 (2016) (Saylor, J.).  If a plaintiff fails to prove she was injured by a product produced by the particular defendant she seeks to hold liable, such a failure is preclusive to the plaintiff's claim.  Al-Yaseri, 166 F. Supp. 3d at 123.

Massachusetts law holds that "[a] manufacturer of a product has a duty to warn foreseeable users of dangers in the use of that product of which he knows or should have known." Mitchell v. Sky Climber, Inc., 369 Mass. 629, 631 (1986).  That duty, however, does not extend to products created by other manufacturers.  Id.; Carrier v. Riddell, Inc. 721 F.2d 867, 869 (1st Cir., 1983) ("[W]e have researched Massachusetts law and

can find no case imposing liability upon a manufacturer (for failure to warn) in favor of one who uses the product of a *different* manufacturer.") (emphasis in original).  In a case analogous to the present controversy, <u>Murray</u> v. <u>Goodrich Engineering Corp.</u>, 30 Mass. App. Ct. 918 (1991), an industrial accident occurred on a machine comprised of integrated components made by various manufacturers.  The plaintiff alleged that Goodrich, as alleged "designer" of the overall system, owed a duty to the plaintiff to ensure to entire system was reasonably safe.  The Court held, however, that Goodrich, as the supplier only of some components of the system, was not the designer of the overall system, and only designed its individual components in the overall machine.  Hence, Goodrich could not be held liable for accidents occurring on components that it did not supply.  <u>Id.</u> at 920.

Finally, Massachusetts law does not create an affirmative duty to warn of risk of harm.  <u>Smith</u> v. <u>Robertshaw Controls Co.</u>, 410 F.3d 29, 38 (1st Cir. 2005).  Where one does voluntarily assume a duty, one must perform that duty with due care.  <u>Id.</u>; <u>Davis</u> v. <u>Westwood Group</u>, 420 Mass. 739, 746 (1995) ("It is an established principle that a duty voluntarily assumed must be discharged with care.").  Moreover, assumption of one duty does not necessary infer assumption of ancillary or related duties.  That is, a voluntarily assumed duty must be unambiguously

assumed by the care giver. Robertshaw, 410 F.3d at 38 ("Put simply, a service call to fix a gas leak in the backyard does not, without more, create a duty to inspect a water heater.").

**D. Rheon Did Not Design Nor Manufacture the Piantedosi Conveyor**

Somasundram's deposition testimony elucidates the exclusive control he maintained over the design and construction of the conveyor belt upon which Pasupathipillai was killed. Somasundram created the blueprints (however rudimentary) of the machine. Somasundram Dep. 132:21-137:14; Toda Aff. ¶ 25. His employees built the machine, id. at 35:24-36:1, 102:10-24, and installed the conveyor belt without any assistance from Rheon, Kameya Aff. ¶ 4. Rheon's involvement with the creation of the conveyor belt then appears to be de minimus. Indeed, even at the demonstration of the Rheon equipment, the conveyor belt was pantomimed by Rheon employees because the conveyor belt was not a Rheon machine. Rheon Line Video.

Mroszycsk makes much of the fact that Rheon advised Somasundram of the ideal height and rate for the conveyor belt and the optimal places in which to bore holes for the flour and cornmeal dusters. Mroszycsk Report 4. Yet, Mroszycsk fails to explain why such seemingly unctuous involvement renders Rheon the manufacturer of the entire conveyor belt. Indeed, the

report reads as an _ipse dixit_ exercise in expert witness advocacy that is long on conclusions and short on logic. Accordingly, this Court can give no weight to Mroszycsk's report, as the report is conclusory in nature, founded on little evidence, and reaches implausible conclusions that are actually contradicted by much of the rest of the evidence on the record. Mroszycsk's report, then, consists of the sort of unsupported speculation and mere conjecture that is to be disregarded at the summary judgement stage.  See _In re Nexium Esomeprazole Anitrust Litig._, 42 F. Supp. 3d 231, 272 (D. Mass. 2014).

Satchi does cite to several Rheon documents that indicate Rheon was aware that Piantedosi was manufacturing its own conveyor belt, and that Rheon was providing limited technical assistance of the sort already described.  August 31 Fax 3; Sept. 12 Fax 3; Sept. 19 Fax 3.  Reading those limited documents in the light most favorable to Satchi fails to overcome the impression given by Somusandram's deposition that he designed, built, and installed the conveyor belt.  The documents cited by Satchi, then, do not stand for the proposition that Rheon was the designer of the conveyor belt in question. At best, Rheon provided limited technical assistance on very minor questions. Certainly, based on the record provided, Rheon had no involvement in the design of the safety features of the conveyor belt.  The safety features were designed by Somusandram, perhaps

[16]

without the consultation of relevant OSHA standards. Somasundram Dep. 138:11-22.

Reading the remaining evidence in the light most favorable to Satchi, it seems implausible Rheon's providing minor technical advice somehow renders Rheon the producer of a machine whose schematics were drawn by Piantedosi, that was built by Piantedosi, and which was installed by Piantedosi. There is, then, no genuine dispute as to the identity of the <u>sole</u> manufacturer of the conveyor belt that killed Pasupathipillai. It was a <u>Piantedosi</u> conveyor belt, not a Rheon conveyor belt. The facts of record no <u>genuine</u> dispute as to this point. <u>See</u> <u>Iverson</u>, 452 F.3d at 98.

Since it was a Piantedosi-manufactured machine that killed Pasupathipillai, Satchi has failed to demonstrate a fundamental element of his negligence and warranty claims against Rheon. <u>See</u> <u>Mathers</u>, 403 Mass. at 691. Accordingly, those claims fail as matter of law.

### E. The August 2007 Contract Does Not Include the Piantedosi Conveyor

The August 2007 contract between Rheon and Piantedosi does not list a conveyor belt to be manufactured by Piantedosi. <u>See</u> August 2007 Contract <u>passim</u>. The contract is a complete agreement, thus meaning those goods not listed amongst its terms

[17]

are not included in the warranty described.  <u>Id.</u> at 8.

Therefore, because the Piantedosi conveyor belt was not included

in the August 2007 complete agreement, no Rheon warranty

attached to the device.  Contrary to Satchi's allegation,

Compl. ¶ 19, Rheon did not contractually assume liability for

the Piantedosi conveyor belt.  All of Satchi's claims based on

such alleged contractual liability or other warranty fail as

matter of law.

### F. Rheon Was Under No Obligation to Assess the Piantedosi Conveyor

It is undisputed that Rheon did not conduct a safety test

of the Piantedosi conveyor belt.  Rheon was not required to do

so.  Yet both Corliss and Mroszczyk assert Rheon was under an

affirmative duty to advise Piantedosi of its safety obligations.

Corliss Aff. ¶ 5; Mroszczyk ¶ 5.  Corliss suggests the source of

this obligation was Rheon's expertise regarding occupational

health and safety, and the opportunities Rheon had to warn

Piantedosi given the checks Rheon made of the Rheon Line.

Corliss Report 13.

Corliss' conclusion is contradicted by law.  Massachusetts

law imposes only a limited affirmative duty to warn.

<u>Robertshaw</u>, 410 F.3d at 38. Manufacturers are obligated to warn

of dangers inherent to their own products. <u>Carrier</u> 721 F.2d at

869.  Yet, in the instant case, Rheon was never under any affirmative duty to warn given the fact that the conveyor belt was not a Rheon product.  See Id.; Goodrich, 30 Mass. App. Ct. at 920.  Corliss' opinion elides that fact.

Rheon had a duty to warn only if it had voluntarily undertaken such a duty.  See Davis, 420 Mass. at 746.  Taking on one duty, however, does not open the floodgates to taking on all duties.  Robertshaw, 410 F.3d at 38. ("Put simply, a service call to fix a gas leak in the backyard does not, without more, create a duty to inspect a water heater.").  Rheon did perform checks of the Rheon Line.  Rheon Trip Report 5/11/2008; Business Trip Report 10/3/2008; Business Trip Report 3/17/2008.  These checks were not safety checks -- they were efficacy checks to make sure the Rheon line delivered dough.  See Somasundram Dep. 187:17-19.  To paraphrase the First Circuit: Put simply, a baking check, does not, without more, create a duty to inspect safety.  Rheon's efficacy checks did not voluntarily place Rheon under a duty to check the safety of Piantedosi's conveyor belt. Corliss' ipse dixit report does not change the law on this matter.

Finally, Satchi alleges Rheon's user manual created an affirmative duty.  Pl.'s Mem. Law 12.  That manual indicates "initial compliance in the design of the machinery is the

[19]

responsibility of the designer and installer of the system."
Manual Excerpt. Rheon, however, was not the "designer and
installer" of the Piantedosi conveyor belt, thus negating the
relevance of Rheon's manual to the conveyor belt.

Accordingly, the record before this Court, even read in the
record most favorable to Satchi, fails to demonstrate Rheon owed
Piantedosi an obligation to perform a safety check of the
Piantedosi conveyor belt. On the record before this Court it is
plain that there is no legal basis by which Rheon could owe such
a duty because Rheon did not design the conveyor belt nor did it
ever assume such a duty voluntarily. Satchi's claims pertaining
to breach of duty fail as matter of law.

**G. Rheon Did Not Violate Massachusetts General Laws Ch. 93A**

Satchi alleges that due to alleged negligence, breached
warranties, and failure to check the Piantedosi conveyor belt,
Rheon engaged in unfair business practices, contravening
Massachusetts General Law Ch. 93A. Pl.'s Mem. 13. Yet, as
noted in the discussion <u>supra</u>, this Court rules there were no
grounds upon which to base a negligence claim against Rheon with
regard to the Piantedosi conveyor because Rheon neither
designed, manufactured, nor installed that conveyor. Rheon did
not warranty or guarantee the Piantedosi conveyor, and the
contract between Rheon and Piantedosi did not extend Rheon's

liability to include the Piantedosi conveyor belt.  Finally,

Rheon had no obligation to perform a safety check of the

Piantedosi conveyor belt and never assumed an affirmative duty

to perform such a check.  Simply stated, then, all of the

theories by which Satchi seeks to saddle Rheon with chapter 93A

liability fail because Rheon did not manufacture the conveyor

belt in question, nor did Rheon ever assume any responsibility

for that conveyor belt.  Satchi's Chapter 93A claims fail as

matter of law.

## IV.  Conclusion and Order

Even when read in the manner most favorable to Satchi, the

facts in this case make evident that Rheon did not design,

manufacture, nor install the conveyor belt that tragically

killed Pasupathipillai.  Thus, Satchi's negligence claims fail

on a threshold issue in product liability.  See Mathers, 403

Mass. at 691.  Further, Rheon never assumed any duty nor

extended any warranty over the Piantedosi conveyor belt.  The

manufacturer of product owes no duty of care to the user of

another product.  See Carrier, 721 F.2d at 869. Thus, Satchi's

contractual and warranty claims against Rheon fail as matter of

law.  As such, all of Satchi's alleged bases for claims under

Mass. Gen. Laws ch. 93a are without merit.  Accordingly, this

Court GRANTS Rheon's motion for summary judgement, ECF No. 43, on all counts.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE